Louis A. MEIER, M.D., et al.

v.

Richard ANDERSON, et al.

Civ. A. No. 87–3145.

United States District Court,
E.D. Pennsylvania.

July 28, 1988.

**548**

Mark F. DiGiovanni, Media, Pa., for plaintiffs.

Daniel M. Gray, Pro Hac Vice.

David M. Donaldson, Sr. Deputy Atty. Gen., Philadelphia, Pa., for defendants.

## OPINION

CAHN, District Judge.

In this case, the plaintiffs present a constitutional challenge to a provision of Pennsylvania's Health Care Services Malpractice Act (the Act), Pa.Stat.Ann. tit. 40, §§ 1301.101 *et seq.* (Purdon Supp.1987). Specifically, the plaintiffs question the constitutionality of the provision establishing the Medical Professional Liability Catastrophe Loss Fund (the CAT Fund), Pa.Stat. Ann. tit. 40, §§ 1301.701(d), (e) and (f) (Purdon Supp.1988). The parties have filed cross motions for summary judgment.

## I. FACTS

The CAT Fund was established as an integral component of a complete overhaul of the medical malpractice insurance industry in Pennsylvania. In the early to middle 1970's, insurance companies began to withdraw from the Pennsylvania medical malpractice insurance market because of the severe losses many companies were suffering due to an increase in successful medical malpractice claims. In order to forestall a complete evacuation of the market, the Commonwealth legislature enacted the Act. Although the immediate goal of the Act is to assure the availability of malpractice insurance for Pennsylvania doctors, the ultimate goal is to ensure that all victims of medical malpractice will be adequately and justly recompensed. Pa.Stat.Ann. tit. 40, § 1301.102 (Purdon Supp.1987).

A key element in attaining both of these goals is a provision which sets a limit on the liability of an insurance company in the event of a malpractice award against one of its insureds. Pa.Stat.Ann. tit. 40, § 1301.701(a)(1), (b) (Purdon Supp.1988). Health care providers, for their part, are required to carry malpractice insurance in an amount equal to this limit. To ensure full recovery by malpractice victims, the Act provides that malpractice victims can recover amounts awarded in excess of the limit from the CAT Fund. Pa.Stat.Ann. tit. 40, § 1301.701(d) (Purdon Supp.1987).

To finance the CAT Fund, an annual surcharge is set at a certain percentage of each health care provider's insurance costs. This percentage is set so as to reimburse the CAT Fund for all claims and expenses paid out in the year prior to the levy and to maintain a fifteen million dollar balance in the CAT Fund account. Pa.Stat.Ann. tit. 40, § 1301.701(e)(1) (Purdon Supp.1988). Since 1984, when it was 52 percent, this percentage rose steadily to 87 percent in 1986, and has dropped to 70 percent in 1988. The Act provides that any health care provider's failure either to maintain the mandatory insurance or pay the CAT Fund surcharge shall result in the revocation or suspension of that health care provider's license to practice medicine. Pa. Stat.Ann. tit. 40, § 1301.701(f) (Purdon Supp.1987).

The plaintiffs in this case, Louis Meier, M.D., Andrew Szebenyi, M.D., and Nelson Erlick, D.P.M., concede that they fall within the Act's definition of health care providers.[1] Consequently, in compliance with the

---

**1.** As defined in the Act, a "health care provider" is:

a primary health center or a person, corporation, facility, institution or other entity licensed or approved by the Commonwealth to provide health care or professional medical

services as a physician, an osteopathic physician or surgeon, a certified nurse, midwife, a podiatrist, hospital, nursing home, birth center....

Pa.Stat.Ann. tit. 40, § 1301.103 (Purdon Supp. 1987).

Act's requirements, each plaintiff has in the past maintained adequate malpractice insurance and has paid the associated surcharge.[2] However, Dr. Szebenyi has not yet made his 1987 CAT Fund payment and, by permission of the Attorney General and the CAT Fund Director, need not do so until the constitutional issues raised herein are resolved. On the other hand, Dr. Meier's request to make quarterly payments on his CAT Fund levy has been denied. Dr. Erlick has made the required payments for 1987.

## II. DISCUSSION

### A. Equal Protection

The right to practice one's chosen profession, including medicine, is protected by both the due process clause and the equal protection clause of the fourteenth amendment. *Schware v. Board of Bar Examiners*, 353 U.S. 232, 238–39, 77 S.Ct. 752, 755–756, 1 L.Ed.2d 796 (1957). However, "[i]t is long settled that states have a legitimate interest in regulating the practice of medicine." *Eatough v. Albano*, 673 F.2d 671, 676 (3d Cir.), *cert. denied*, 457 U.S. 1119, 102 S.Ct. 2931, 73 L.Ed.2d 1331 (1982); *see also Bigelow v. Virginia*, 421 U.S. 809, 827, 95 S.Ct. 2222, 2235, 44 L.Ed. 2d 600 (1975).

The plaintiffs contend that the CAT Fund violates the equal protection clause because it unreasonably discriminates between health care providers as defined in the Act, and other professionals such as chiropractors who are not subject to similar requirements. Their argument, therefore, at least in part, is that the statute is under-inclusive.[3] In support of this contention, the plaintiffs suggest that the right to practice one's chosen profession is fundamental, and, therefore, that the CAT Fund should be strictly scrutinized to determine whether the distinction between health care providers and other professionals is " 'tailored' narrowly to serve legitimate objectives." *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 16–17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973).

The plaintiffs err, however, in classifying the right to practice one's chosen profession as a fundamental right. To be fundamental, a right must be "explicitly or implicitly guaranteed by the Constitution." *Rodriguez*, 411 U.S. at 33, 93 S.Ct. at 1297. The right to practice one's profession is neither explicitly nor implicitly enumerated in the Constitution, and cannot, therefore, be considered a fundamental right. *See Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 2566–67, 49 L.Ed.2d 520 (1976) ("[A] standard less than strict scrutiny 'has consistently been applied to state legislation restricting the availability of employment

**2.** The plaintiffs have paid the following amounts for the required basic coverage and associated surcharge:

| | | Dr. Meier | Dr. Szebenyi | Dr. Erlick |
|---|---|---|---|---|
| | Basic Coverage | | $ 11,173 | $ 2,106 |
| 1984 | Surcharge | N/A | 5,510 | 1,095 |
| | Gross Income | | 105,135 | 100,000 |
| | Basic Coverage | $ 11,172 | 15,117 | 3,370 |
| 1985 | Surcharge | 5,810 | 10,582 | 2,300 |
| | Gross Income | 153,865 (1984) | 177,503 | 120,000 |
| | Basic Coverage | 15,100 | 25,574 | 4,870 |
| 1986 | Surcharge | 10,570 | 22,249 | 4,237 |
| | Gross Income | 157,522 (1985) | 99,632.99 | 140,000 |
| | Basic Coverage | 25,574 | 24,823 | 6,370 |
| 1987 | Surcharge | 22,249 | 22,249 | 5,542 |
| | Gross Income | 164,302 (1986) | N/A | N/A |

**3.** *See* Pa.Stat.Ann. tit. 63, § 625.508(c) (Purdon Supp.1988) ("The board may waive the requirement that a [chiropractor] obtain professional liability insurance ... if ... the licensee is un-able to obtain such insurance ... because of general market conditions...."). There is no similar provision applicable to health care providers under the Act.

opportunities.' ") (quoting *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970)); *Harper v. Lindsay,* 616 F.2d 849, 854 (5th Cir.1980). Moreover, because health care providers are neither a suspect nor quasi-suspect class, a rational relation test is the appropriate test of the CAT Fund's constitutionality. *Eatough,* 673 F.2d at 676; *McCoy v. Commonwealth Bd. of Medical Educ. & Licensure,* 37 Pa.Commw. 530, 391 A.2d 723, 728 (1978); *see also Brandwein v. California Bd. of Osteopathic Examiners,* 708 F.2d 1466, 1470 (9th Cir.1983); *Rabino v. Commonwealth State Registration Bd. for Professional Eng'rs,* 69 Pa.Commw. 191, 450 A.2d 773, 775 (1982); *Kennedy v. Hughes,* 596 F.Supp. 1487, 1492–93 (D.Del. 1984).

To pass constitutional muster under the rational relation test, a statute must be rationally related to the achievement of a legitimate state interest. *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 942–43, 59 L.Ed.2d 171 (1979); *Murgia,* 427 U.S. at 312, 96 S.Ct. at 2566; *Malmed v. Thornburgh,* 621 F.2d 565, 573 (3d Cir.), *cert. denied,* 449 U.S. 955, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980). The statute will be overturned only if "the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the legislature's actions were irrational." *Eatough,* 673 F.2d at 676 (quoting *Bradley,* 440 U.S. at 97, 99 S.Ct. at 942–43). The great deference given to legislatures under this standard is underscored by the courts' willingness to uphold a statute "if any state of facts reasonably may be conceived to justify it," *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961), even if the ultimately reasonable justification did not in fact underlay the legislative decision. *Flemming v. Nestor,* 363 U.S. 603, 612, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960). Plaintiffs' "equal protection challenge must fail unless the [Commonwealth] could not reasonably believe that the exempted [professionals] are different in relevant respects from" health care providers subject to the Act's requirements.

*New York State Club Ass'n, Inc. v. City of New York,* — U.S. —, —, 108 S.Ct. 2225, 2234–35, 101 L.Ed.2d 1 (1988).

The constitutionality of the mandatory malpractice insurance component of the Act, Pa.Stat.Ann. tit. 40, § 1301.701(a) (Purdon Supp.1987), has already been sustained. *McCoy,* 391 A.2d at 729. Although the CAT Fund presents a slightly different set of facts, I find that its constitutionality, using the analytical framework set out above, is beyond question. As stated earlier, the immediate goal of the Act is to provide insurance for health care providers, and the ultimate goal of the Act is to provide full and adequate compensation to medical malpractice victims. Pa.Stat.Ann. tit. 40, § 1301.102 (Purdon Supp.1987); *McCoy,* 391 A.2d at 729. To be upheld, the CAT Fund's distinction between "health care providers" and non-health care providers must be rationally related to the achievement of either goal.

The CAT Fund attempts to achieve these goals by establishing a fund from which malpractice victims can recover amounts in excess of an insured's policy limit. Pa. Stat.Ann. tit. 40, § 1301.701(d) (Purdon Supp.1987). In addition, the CAT Fund provides compensation for injuries inflicted by a physician who is retired or has relocated and is no longer covered by malpractice insurance. *Id.* The defendants argue that the distinction made by the Act is justified by the higher risks associated with surgery and other medical procedures than those associated with the practice of chiropractors and other professionals not covered by the Act. *See* Affidavit of Joseph Vacondios. Therefore, they imply, it is rational to target "health care providers" because it is their risky activities that are primarily responsible for increasingly numerous and large malpractice claims.

The plaintiffs have offered no evidence to counter this justification of the classification employed by the Act. Because the plaintiffs bear the burden of proving unconstitutionality under the rational relation test, *Parham v. Hughes,* 441 U.S. 347, 351, 99 S.Ct. 1742, 1745–46, 60 L.Ed.2d 269 (1979); *Bradley,* 440 U.S. at 111, 99 S.Ct.

at 949–50, and the classification in any event appears eminently reasonable, I have no alternative but to reject their equal protection claim. The Commonwealth could reasonably believe that exempted professionals are different from statutory health care providers because the services performed by exempted professionals are less risky, pose less of a threat to patients, and therefore, are less responsible for the medical malpractice insurance crisis than the services performed by statutory health care providers. In addition, the Commonwealth could reasonably believe that it was not necessary to provide for the availability of a waiver for health care providers based on "general market conditions" because it had established a joint underwriting association to provide malpractice insurance "to those providers who cannot conveniently obtain insurance." Pa.Stat.Ann. title 40, § 1301.801 (Purdon Supp.1988).

Finally, "a statutory classification impinging upon no fundamental interest, and especially one dealing only with economic matters, need not be drawn so as to fit with precision the legitimate purposes animating it." *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 813, 96 S.Ct. 2488, 2499, 49 L.Ed.2d 220 (1976). The Constitution permits states to "adopt[ ] regulations that only partially ameliorate a perceived evil and defer[ ] complete elimination of the evil to future regulations." *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976). Therefore, even if exempted professionals posed risks similar to those posed by statutory health care providers, the Pennsylvania legislature could reasonably decide to attack the problem "one step at a time." *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955).

■ The plaintiffs also argue that the statute is over-inclusive—that is, that not only "high risk" doctors but also doctors with no prior malpractice claims are required to contribute to the CAT Fund. The Commonwealth legislature, however, could have reasonably believed that the viability of the fund, as with any insurance scheme, depends on spreading the costs and risks associated with medical malpractice claims among both "high" and "low" risk doctors. *See McCoy*, 391 A.2d at 727. Moreover, because the amount each doctor is required to contribute to the fund is determined as a percentage of his or her malpractice insurance premium, that amount automatically reflects the doctor's claim history.

The Commonwealth legislature could also reasonably have believed that it was impossible accurately to predict, based on prior claims history, which doctors would commit acts of professional malpractice. If "low" risk doctors were given statutory exemptions and later committed malpractice, their victims might be left remediless. The legislature could reasonably have believed that justice would be better served by requiring universal participation by health care providers than by leaving open the possibility that some malpractice victims would be remediless. Finally, statutes challenged as overinclusive, like statutes challenged as underinclusive, need not be drawn with mathematical exactitude. *Dandridge*, 397 U.S. at 484, 486–87, 90 S.Ct. at 1162–63. There are several states of facts which reasonably may be conceived to justify the classification drawn by the Commonwealth and the Act accordingly will be upheld.

B. Substantive Due Process

■ In addition to their equal protection claim, the plaintiffs claim that the CAT Fund provision violates their substantive due process rights. Having concluded that the Act does not violate the equal protection clause, it arguably "follows a fortiori that the Act does not violate the Fourteenth Amendment's Due Process Clause." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 470 n. 12, 101 S.Ct. 715, 727 n. 12, 66 L.Ed.2d 659 (1981); *see also Western & S. Life Ins. Co. v. Board of Equalization*, 451 U.S. 648, 656 n. 7, 101 S.Ct. 2070, 2076 n. 7, 68 L.Ed.2d 514 (1981). Nonetheless, I will briefly examine plaintiffs' substantive due process argument on its own merits.

■ It is true, as plaintiffs contend, that the right to practice one's chosen profes-

sion free from *unreasonable* governmental interference falls within the "liberty" and "property" concepts of the fifth and fourteenth amendments. *Greene v. McElroy,* 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377 (1959); *Schware,* 353 U.S. at 238–39, 77 S.Ct. at 755–56. The corollary of this proposition is that the states may reasonably regulate the professions in the public interest without violating the due process clause of the fourteenth amendment. *See McCoy,* 391 A.2d at 727. To survive scrutiny under the due process clause, as under the equal protection clause, legislation must be aimed at furthering a legitimate state interest—that is, it must seek to promote some public value. *See* Note, *Within the States' Jurisdiction:* Metropolitan, Northeast Bancorp, *and the Equal Protection Clause,* 96 Yale L.J. 2109, 2123 (1987). In addition, because no fundamental right is implicated in this case, *Woods v. Holy Cross Hosp.,* 591 F.2d 1164, 1173 (5th Cir.1979), the legislation must be *rationally related* to furthering a legitimate state purpose. *Malmed,* 621 F.2d at 576–78 & n. 17. Taken together, these inquiries do not constitute an especially rigorous test of constitutionality. "It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson,* 348 U.S. at 488, 75 S.Ct. at 464. As the Court of Appeals for the Third Circuit has stated, "the due process clause of the fourteenth amendment protects [only] against arbitrary or irrational government action." *Neiderhiser v. Borough of Berwick,* 840 F.2d 213, 217 (3d Cir.1988).

▪ The Commonwealth has legitimate interests in regulating the practice of medicine, *Eatough,* 673 F.2d at 676, in assuring the availability of medical malpractice insurance, *Country–Wide Ins. Co. v. Harnett,* 426 F.Supp. 1030, 1035 (S.D.N.Y.) (three-judge court) ("Regulation of the insurance industry, in order to provide adequate protection of the public, is surely a proper subject for the state's exercise of its police power."), *aff'd,* 431 U.S. 934, 97 S.Ct. 2644, 53 L.Ed.2d 252 (1977), and in assuring full compensation for malpractice victims.

*See Alaska Packers Ass'n v. Industrial Accident Comm'n,* 294 U.S. 532, 55 S.Ct. 518, 79 L.Ed. 1044 (1935) (fact that injured employees "would be remediless, and … that they might become public charges [are] both matters of grave public concern to the state"); *Dimond v. District of Columbia,* 792 F.2d 179, 186 (D.C.Cir.1986) (both purpose to ensure full recovery by accident victim of out-of-pocket expenses and purpose to ensure full recovery of non-economic losses by any victim with a serious injury are legitimate); *Hoffman v. United States,* 767 F.2d 1431, 1437 (9th Cir.1985) (state has legitimate interest in aiding "patients who might be injured by such [uninsured] doctors" by removing "the prospect of uncollectible judgments").

Turning to the rational relation inquiry, the relevant issue in the substantive due process context is whether the provision itself, rather than the classification, is rationally related to the achievement of a legitimate state purpose. *Malmed,* 621 F.2d at 578. Consequently, under the facts of this case, the substantive due process question turns on whether the Commonwealth legislature could reasonably have believed that the CAT Fund provision was a rational means of assuring the availability of medical malpractice insurance or of assuring full compensation for malpractice victims. In *McCoy,* the issue was the constitutionality of the mandatory insurance component of the Act. The *McCoy* court also felt constrained, however, to analyze the constitutionality of the CAT Fund because of the inextricable interrelationship between the two provisions. *McCoy,* 391 A.2d at 727. As one component of a multifaceted legislative creation, the CAT Fund must also be examined within that entire scheme.

The CAT Fund was formulated as "the legislative quid pro quo to insurance companies' continuing to provide malpractice insurance coverage in Pennsylvania." *McCoy,* 391 A.2d at 727. The penultimate goal of the Act, ensuring the availability of medical malpractice insurance in Pennsylvania, was achieved by placing a cap on each carrier's liability for any one occur-

rence and by absolving carriers from liability for any act of malpractice committed by one of its insureds in prior years. The Commonwealth legislature could reasonably have believed that these limitations on the liability of insurance carriers would foster the continuing availability of medical malpractice insurance in Pennsylvania.

The ultimate goal of the Act, assurance of a full recovery by malpractice victims, is achieved by the establishment of the CAT Fund from which victims may draw the proceeds of a verdict which exceeds the carriers' liability. The Commonwealth legislature could have reasonably believed that the CAT Fund would directly promote full recovery by medical malpractice victims. Therefore, "[r]egardless of the ultimate economic efficacy of the statute," *see, e.g.,* Hofflander & Nye, *Medical Malpractice Insurance in Pennsylvania* at 49 (1985), I "have no hesitancy in concluding that it bears a reasonable relation to the [Commonwealth's] legitimate purpose in controlling" the medical malpractice insurance market in Pennsylvania. *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 124–25, 98 S.Ct. 2207, 2213–4, 57 L.Ed. 2d 91 (1978).

■ The plaintiffs also argue that the Act creates two irrebutable presumptions in violation of the due process clause of the fourteenth amendment. The plaintiffs maintain that the Act presumes both "that each individual physician will be actionably negligent while practicing his profession during the course of his career," and "that no health care provider will have sufficient assets to compensate a patient for injuries relating to the physician's treatment of the patient."

The plaintiffs' contention, in the first place, is simply incorrect. The Act does not presume that all doctors will be actionably negligent; rather, it presumes that all doctors *might* be actionably negligent, and that, given the difficulty of predicting which doctors will be negligent, it is reasonable to require all doctors to contribute to a fund designed to compensate malpractice victims. Nor does the Act presume that no doctor will ever have sufficient

assets to compensate a patient for his or her injuries; in fact, the Act presumes that some doctors will be capable of adopting self-insurance plans sufficient to comply with the Act's basic coverage requirements. *See* Pa.Stat.Ann. tit. 40, § 1301.701(a), (a)(1)(i), (a)(1)(ii), (a)(2) (Purdon Supp.1988). With respect to the CAT Fund surcharge, the Act presumes only that, given the difficulty of predicting which doctors will be actionably negligent, given the impossibility of predicting the amount of any liability judgment that will be entered against a negligent doctor, and given the need to ensure the economic viability of the Fund, it is reasonable to require contributions from all health care providers in proportion to their basic coverage premiums.

■ More importantly, irrebuttable presumption attacks are premised on a request to the court that the plaintiff be allowed to rebut the statutory presumption on the ground that "the Due Process Clause require[s] a more individualized determination." *Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 645, 94 S.Ct. 791, 799, 39 L.Ed.2d 52 (1974); *see also United States Dept. of Agric. v. Murry,* 413 U.S. 508, 518, 93 S.Ct. 2832, 2837–38, 37 L.Ed.2d 767 (1973) (Douglas, J., concurring) (question is whether "the Due Process Clause requires the Government to act on an individualized basis [by using a well-designed hearing procedure], with general propositions serving only as rebuttable presumptions or other burden shifting devices"); *Vlandis v. Kline,* 412 U.S. 441, 453, 93 S.Ct. 2230, 2237, 37 L.Ed.2d 63 (1973) (question is whether statute is unconstitutional "because .it provides no opportunity for students ... to demonstrate that they have become bona fide Connecticut residents"). The plaintiffs have not attempted to show, nor requested an opportunity to show, that they will not "be actionably negligent ... during the course of [their] career[s]" or that they will "have sufficient assets to compensate a patient for injuries relating to [their] treatment of the patient." Given the nature of these presumptions, based as they are on predictions, it is highly unlikely

that the plaintiffs could make either of these showings.[4]

The object of the plaintiffs' irrebuttable presumption attack seems instead to be the reasonableness of the legislature's supposed reliance on these presumptions in fashioning the statutory scheme of the Act. *See* Plaintiffs' Memorandum at 18 ("Neither one of these presumptions is totally true yet the Act's purpose of compensating health care victims seems to be clearly based on them."). To the extent that this is the crux of the plaintiffs' argument, it is clearly foreclosed by my finding that the Act is rationally related to legitimate state interests and therefore comports with the requirements of the due process clause of the fourteenth amendment.[5]

### C. Takings Clause

■ The plaintiffs contest the constitutionality of the Act on the additional ground that assessing the CAT Fund surcharge against all doctors—instead of placing the burden of compensating malpractice victims on society as a whole, or solely on those doctors who commit acts of malpractice—constitutes a "taking" in violation of the fifth and fourteenth amendments. In support of this contention, plaintiffs make reference to the decision of the United States Supreme Court in *Nollan v. California Coastal Comm'n*, — U.S. ——, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987).

In *Nollan*, the Court stated that "land use regulation does not effect a taking if it 'substantially advance[s] legitimate state interests' and does not 'den[y] an owner economically viable use of his land.'" *Nollan*, 107 S.Ct. at 3146 (quoting *Agins v.*

*Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980)) (bracketed material added by *Nollan* court). Because the "property" at issue in this case is not real property, the standard enunciated in *Agins* and *Nollan* is not applicable.[6] Rather, the court has identified three factors which have "particular significance" in determining whether governmental regulation constitutes a taking of property: "(1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.'" *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 225, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986) (quoting *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)). A district court, however, should not apply these factors rigidly. The Supreme Court has "'eschewed the development of any set formula ... and ha[s] relied instead on ad hoc, factual inquiries into the circumstances of each particular case.'" *Bowen v. Gilliard*, — U.S. ——, 107 S.Ct. 3008, 3020, 97 L.Ed.2d 485 (1987) (quoting *Connolly*, 475 U.S. at 224).

First, with respect to the nature of the governmental action, the Commonwealth has not physically invaded or permanently appropriated for its own use any of plaintiffs' assets. Instead, the Act requires doctors to maintain medical malpractice insurance and to contribute an additional percentage of their insurance premium to the CAT Fund. The Act safeguards malprac-

---

4. Even if it were possible, it is doubtful that the plaintiffs would want to make the latter showing since it would undercut their argument that "the Act is confiscatory and rises to the level of a 'taking' of property from the individual plaintiff physicians." Plaintiffs' Memorandum at 25.

5. In any event, irrebuttable presumption analysis is appropriate only "where the private interests affected are *very important*." *United States Dept. of Agric. v. Murry*, 413 U.S. 508, 518, 93 S.Ct. 2832, 2837, 37 L.Ed.2d 767 (1973) (Douglas, J., concurring) (emphasis added); *see also Weinberger v. Salfi*, 422 U.S. 749, 785, 95 S.Ct. 2457, 2476–77, 45 L.Ed.2d 522 (1975) (upholding statute and distinguishing programs involving

"affirmative Government action which seriously curtails important liberties cognizable under the Constitution"). Without reaching the issue, I note that it is a matter of considerable doubt whether the right to practice medicine without being subject to statutory surcharges is an important liberty cognizable under the Constitution.

6. Even if this standard were applicable, I would find that the Act substantially, if not directly, advances the Commonwealth's legitimate interests in compensating malpractice victims and in ensuring the continued availability of medical malpractice insurance.

tice victims and ensures the continued availability of malpractice insurance. "This interference with ... property rights ... arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and ... does not constitute a taking requiring Government compensation." *Connolly,* 475 U.S. at 225, 106 S.Ct. at 1026; *see also Keystone Bituminous Coal Ass'n v. De-Benedictis,* 480 U.S. 470, 107 S.Ct. 1232, 1244, 94 L.Ed.2d 472 (1987). This is not the type of enactment that "forc[es] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960).

Second, with regard to the economic severity of the Act, "there is no doubt that the Act completely deprives a [doctor] of whatever amount of money [the doctor] is obligated to pay to fulfill its statutory liability." *Connolly,* 475 U.S. at 225, 106 S.Ct. at 1026. As in *Connolly,* however, the assessment is not made in a vacuum. The applicable surcharge is determined by reference to each doctor's medical malpractice premium which presumably depends, at least in part, on the doctor's claim history. Moreover, doctors are protected under the statutory scheme from liability for medical malpractice claims, including claims in excess of their malpractice insurance policy limits. The Act, therefore, is a classic instance of legislation that produces a "reciprocity of advantage." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922); *see also Keystone,* 107 S.Ct. at 1245. Thus, doctors as well as malpractice victims benefit from the Act.

In addition, the facts in the present case reveal that the premium and surcharge have historically constituted between 5 and 50 percent of the plaintiffs' gross incomes. Although this percentage undoubtedly represents a large proportion of plaintiffs' costs of doing business, it has not yet denied them "the economically viable use of th[eir] property." *Keystone,* 107 S.Ct. at 1247–1249; *see also United States v. General Motors Corp.,* 323 U.S. 373, 378, 65

S.Ct. 357, 359–60, 89 L.Ed. 311 (1945) (taking exists if effects of governmental action "are so complete as to deprive the owner of all or most of his interest in the subject matter"); *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). No plaintiff has shown an inability to pay or that he can no longer pursue his occupation because of the added expense of the CAT Fund surcharge.

Finally, with respect to the extent to which the regulation has interfered with distinct investment-backed expectations, it is clear that "[a] 'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.'" *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984) (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct. 446, 451, 66 L.Ed.2d 358 (1980)). The plaintiffs have not shown that they have an investment-backed expectation of maintaining a certain income level in a regulated profession. Moreover, as stated earlier, in the absence of regulation doctors would have an expectation that they might be held liable for a substantial malpractice judgment. The Act eliminates the expectation of possible tort liability by requiring that doctors procure malpractice insurance and pay an additional premium for excess coverage. The plaintiffs, therefore, have a difficult time showing that they have suffered a cognizable loss, let alone a taking. More importantly, the field of medicine has long been regulated. "Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *FHA v. The Darlington, Inc.,* 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958). A license to practice medicine, like other rights, is "subject to modification by 'the public acts of government.'" *Bowen,* 107 S.Ct. at 3021 (quoting *Reichelderfer v. Quinn,* 287 U.S. 315, 319, 53 S.Ct. 177, 179, 77 L.Ed. 331 (1932)).

Having upheld the Act against a substantive due process attack, it would be surprising to discover that the Commonwealth had

unconstitutionally "taken" the surcharges that it was earlier determined are an integral part of a legitimate and rational statutory scheme. *See Connolly*, 475 U.S. at 223, 106 S.Ct. at 1025. The standards, of course, for reviewing a due process challenge are different than those employed in the takings context. *Nollan*, 107 S.Ct. at 3147 n. 3. However, having examined the factors mentioned above, and viewing the statutory scheme in its entirety, I am "far from persuaded that fairness and justice require the public, rather than ... [doctors], to shoulder the responsibility for" compensating medical malpractice victims.[7] *Connolly*, 475 U.S. at 227, 106 S.Ct. at 1027.

### D. Procedural Due Process

■ The plaintiffs argue that the Act is unconstitutionally defective because it fails to provide adequate procedural safeguards before a health care provider's license is revoked for failure to comply with the Act. Specifically, the plaintiffs complain that "[a]lthough the Act provides a hearing opportunity to physicians, they cannot plead an inability to pay the required fees." Plaintiffs' Memorandum at 14. The defendants concede that the plaintiffs have an interest in their medical licenses that is protected by the fourteenth amendment.

■ To the extent that the plaintiffs argue that they will be denied due process if they are not permitted to raise the defense of an *inability* to pay at some future license revocation proceeding, they seem to be attacking the substance of the Act rather than the procedure used to enforce it.[8] As the Supreme Court stated in *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985):

Property interests are not created by the Constitution, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law...." *Board of Regents v. Roth*, supra [408 U.S. 564], at 577 [92 S.Ct. 2701, at 2709, 33 L.Ed.2d 548 (1972)].

....

... The point is straightforward: the Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct. Were the rule otherwise, the Clause would be reduced to a mere tautology. "Property" cannot be defined by the procedures provided for its deprivation any more than can life or liberty.

*Id.* at 538, 541, 105 S.Ct. at 1491, 1492–93. Just as the states cannot avoid the strictures of the due process clause by defining as substantive that which is really procedural, so individuals cannot expand the scope of due process by defining as procedural that which is really substantive.

However, it is not necessary for me to pursue this line of inquiry. As I stated with respect to the plaintiffs' takings claim, "[n]o plaintiff has shown an inability to pay or that he can no longer pursue his occupation because of the CAT Fund surcharge." Moreover, no license revocation proceedings have been initiated against any of the plaintiffs.[9] Finally, the Commonwealth has represented that, contrary to the plaintiffs' contentions, the Board of Licensure considers mitigating factors in determining

---

**7.** The plaintiffs suggest that the Commonwealth should have adopted various funding methods used by other states. Plaintiffs' Memorandum at 23. Even assuming alternative funding methods would be wiser or fairer, which I doubt, the Commonwealth is not required by the Constitution to adopt the most effective, or the least restrictive, statutory scheme. *See Keystone*, 107 S.Ct. at 1243 n. 16.

**8.** Plaintiffs' procedural due process argument that a *failure* to pay the CAT Fund surcharges should not be sufficient grounds for revocation of a medical license merely restates plaintiffs'

equal protection and substantive due process arguments. It fails, therefore, for reasons substantially similar to those enumerated in sections IIA and IIB above.

**9.** Even if license revocation proceedings had been initiated, but had not, along with any appeals, run their course, comity might require that the federal courts await a decision by the Commonwealth courts on whether inability to pay is a defense under the Act. *See Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

what penalty if any is appropriate for violations of the Act's requirements. *See* Defendants' Memorandum at 7–8. No plaintiff has shown that he cannot pay the surcharge and no record has been made as to what position the Commonwealth would take with respect to a doctor who could show that it was financially impossible for him or her to meet the Act's requirements. For these reasons, I find that plaintiffs' procedural due process challenge is not ripe for adjudication.

I am not precluded from making such a determination because I have reached the merits on the majority of the plaintiffs' claims. The Supreme Court has stated that "[e]ven where some of the provisions of a comprehensive legislative enactment are ripe for adjudication, portions of the enactment not immediately involved are not thereby thrown open for a judicial determination of constitutionality." *Communist Party v. Subversive Activities Control Bd.,* 367 U.S. 1, 71, 81 S.Ct. 1357, 1397, 6 L.Ed.2d 625 (1961). Because it would be "conjectural to anticipate that" the plaintiffs will be unable to meet their obligations under the Act and that the Board will revoke their licenses in spite of this inability, an opinion on the procedural due process issue "would be patently advisory." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 304, 99 S.Ct. 2301, 2311–12, 60 L.Ed.2d 895 (1979). With respect to the procedural due process issue, this is not a case "[w]here the inevitability of the operation of a statute against certain individuals is patent." *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 143, 95 S.Ct. 335, 358, 42 L.Ed.2d 320 (1974).

While ripeness determinations depend in part on " 'the hardship to the parties of withholding court consideration,' " *Pacific Gas & Elec. Co. v. State Energy Resources Conserv. and Dev. Comm'n,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983) (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)), and the plaintiffs contend that their reputation will be injured if they receive review only after the revocation proceedings have run their course, I do not believe that this limited hardship outweighs the factors militating in favor of denying a decision on this issue in the absence of an adequate factual record. Because the plaintiffs have complied with the Act and have not been sanctioned for failing to comply, their claim that sanctions would be imposed without due process is not ripe. *See Hotel & Restaurant Employees Int'l Union Local 54 v. Read,* 832 F.2d 263, 266 (3d Cir.1987). Therefore, plaintiffs' procedural due process claim will be denied.

### III. CONCLUSION

For the reasons stated above, plaintiffs' challenge to the constitutionality of the Act is denied in its entirety.