UNITED WIRE, METAL & MACHINE
HEALTH AND WELFARE FUND,
et al., Plaintiffs,

v.

MORRISTOWN MEMORIAL
HOSPITAL, et al.,
Defendants.

Civ. A. No. 90–2639.

United States District Court,
D. New Jersey.

May 27, 1992.

As Amended July 6, 1992.

Ronald E. Wiss, David A. Schrader, Wolff & Samson, Roseland, N.J., Albert G. Kroll, Verona, N.J., Thomas W. Gleason, New York City, Louis Pechman, Lambos & Giardino, Newark, N.J., David Grossman, Schneider, Cohen, Solomon, Leder & Montalbano, Cranford, N.J., Thomas V. Jardine, Joseph R. Pagano, Jardine & Pagano, Springfield, N.J., James R. Zazzali, Zazzali, Zazzali, Fagella & Nowak, Newark, N.J., for plaintiffs.

Benjamin Clarke, Sr. Deputy Atty. Gen., Eileen C. Stokley, Deputy Atty. Gen., Trenton, N.J., for defendants.

Frank Ciesla, Elizabeth Dusaniewskyj, Giordano, Halleran & Ciesla, Middletown, N.J., for defendant/intervenor.

## OPINION

WOLIN, District Judge.

Currently before the Court are defendants' and plaintiffs' cross-motions for summary judgment. Initially, this Court finds that the Eleventh Amendment does not prevent this Court from deciding any claims brought against the state agencies and the officials employed by the State of New Jersey. Likewise, this Court finds that New Jersey's hospital rate setting

mechanism does not constitute a tax, and therefore the Tax Injunction Act does not foreclose this Court from deciding the issues before it.

This Court will grant defendants' motions for summary judgment as to plaintiffs' federal constitutional claims. This Court further holds, however, that ERISA pre-empts certain provisions included in New Jersey's scheme for regulating hospital rates and the regulations promulgated thereunder. Therefore, this Court finds that New Jersey's hospital rate setting scheme is unenforceable. Due to the potential impact of its decision, this Court will stay its Order for a period of ten days to afford the parties an opportunity to appeal the Court's ruling to the Third Circuit Court of Appeals.

## I. INTRODUCTION

Several self-insured union employee welfare benefit plans (the "Benefit Plans") qualified under the Employee Retirement Income Security Act, 29 U.S.C. § 1002 *et seq.*, as amended ("ERISA") and their participants (the "individual plaintiffs") (collectively the "plaintiffs"), have brought an action in which they seek a declaration that New Jersey's scheme for setting hospital rates is invalid.[1] Plaintiffs argue that this Court must strike down the method New Jersey utilizes for determining hospital rates on both federal and state constitutional grounds and because ERISA pre-empts the state statute.

The gravamen of the complaint focuses on charges included within the hospital billing procedure which are in excess of a patient's "actual hospital costs." These include: costs of care for the indigent, charges to pay a hospital's bad debts, subsidies for the medicare program, and fees to reimburse hospitals for discounts given by the hospitals to other types of benefit plans.

1. This action was consolidated pursuant to order on January 31, 1992.

2. In their brief in opposition to the hospital defendants motion for summary judgment, plaintiffs concede that they are not asking this Court to apply its decision retroactively, but merely seek restitution because they paid the

This Court has jurisdiction over plaintiffs' claims brought under the United States Constitution, ERISA and the Taft–Hartley Act pursuant to 28 U.S.C. § 1132. This Court has jurisdiction over plaintiffs' causes of action that arise under New Jersey's Constitution under the principles of pendent jurisdiction and supplemental jurisdiction, 28 U.S.C. § 1367.

In the exercise of its discretion, however, this Court declines to consider the Carpenter's Union's claim that this Court should force the Hospital Defendants to reimburse the charges paid by the Carpenter's Union under protest. The Court declines to exercise its pendent jurisdiction and supplemental jurisdiction over this state law claim in the interest of comity. The Carpenter's Union argues that the fees should be reimbursed because they were paid under compulsion—the hospital rate setting regulation forces a hospital to institute collection actions against parties who refuse to pay DRG rates. The New Jersey State Courts have never faced this issue. Moreover, the Hospital Defendants commenced related actions, which are currently pending in New Jersey, in which they seek reimbursement from plaintiffs who failed to pay the contested charges. In view of the interrelatedness of these actions, this Court will defer to the New Jersey State Courts.[2] Venue is proper in this district under 28 U.S.C. § 1391.

## II. BACKGROUND

In 1971 New Jersey enacted the Health Care Facilities Planning Act (the "Act"), a hospital rate setting scheme for Blue Cross and certain federally funded programs such as Medicaid. L.1971 c. 136 § 18. Rates were based primarily on a hospital's actual costs for each patient who participated in the programs encompassed by the law. In 1978, New Jersey passed a statute

DRG rate under protest and duress. Accordingly, the issue of when to apply a decision retroactively under federal law does not confront this court. Thus, this Court can refuse to exercise its pendent jurisdiction over plaintiffs restitution claims.

that amended the 1971 legislation and, in part, mandated rate setting for all payors. L.1978 c. 83 ("Chapter 83"). Chapter 83 contained a dual purpose: to "contain the rising costs of health care services, and to ensure the financial solvency of hospitals."

Chapter 83 designed an interconnected regulatory system to embrace its purposes. Chapter 83 gave the Commissioner of Health (the "Commissioner") responsibility for overall supervision and administration of the hospital rates. The Commissioner, in conjunction with the Health Care Administration Board (the "Board"), proposes the rate schedule and determines, in accordance with the statute, the types of charges that should be included in hospital rates. Additionally, the law created the New Jersey Hospital Rate Setting Commission (the "Commission"). The Commission approves hospital rates. N.J.S.A. 26:2H–4.1; 26:2H–18.1; 26:2H–18.9; N.J.A.C. 8:31B–3.72; N.J.A.C. 8:31B–3.39. The New Jersey Department of Health (the "DOH") oversees the Commission and administers the rates.

In order to help contain costs, Chapter 83 set hospital rates prospectively, instead of upon actual cost. Under Chapter 83, various procedures are divided into diagnostic related groups ("DRG"), and a rate is assigned to each DRG. Instead of charging actual costs incurred by a hospital for treating an individual patient, the hospital has to charge the DRG rate which is designated for that classification. Despite the calculation of bills without regard to actual costs, a hospital bill still reflects a charge that previously represented actual costs. This charge is categorized as "total costs." A "DRG" charge also appears on a patient's bill.

A particular hospital's DRG rate consists of a weighted average of the cost incurred by that specific hospital to treat a particular illness and the average cost incurred by hospitals throughout the state to treat the condition. Accordingly, this system penalizes a hospital that incurs costs greater than that allocated to a particular DRG category and rewards hospitals that provide more efficient services for a particular DRG.[3]

Additionally, as part of its DRG rate, a hospital must include a charge for uncompensated care. Uncompensated care consists of both care to the indigent and expenses that result from bad debts. N.J.S.A. 26:2H–18.d; N.J.A.C. 8:31B–3.41; 8:31B–7.1. This charge stems from a hospital's mandate to admit anyone regardless of his or her ability to pay.[4] Only hospital patients incur costs for uncompensated care. In order to receive funds for uncompensated care a hospital must determine whether a patient has any health insurance.

Furthermore, hospitals that treat patients who have Medicare can recoup only the amount allotted by the Medicare system for the particular treatment. Medicare invariably pays less than the DRG rate allocated for a particular condition. N.J.S.A. 26:2H–18.1c, however, permits the Commissioner with the approval of the Board, "to adjust the DRG rate to account for costs incurred by statutes and regulations that affect the delivery of health care." Pursuant to this statute, the Commissioner, with the Board's approval, enacted N.J.A.C. 8:31B:3.73. This regulation allows the hospitals to include in their DRG

**3.** The costs incurred by a hospital include both direct costs and indirect costs. Direct costs include salaries and fringe benefits provided to employees engaged in the direct delivery of patient care, N.J.A.C. 8:31B–3.21, N.J.A.C. 8:31B–3.16. Indirect costs consists of funds expended by a hospital in order to manage the hospital, to allow the hospital to engage in research and to provide for the maintenance needed to upkeep a hospital.

**4.** The 1978 Amendments mandated an inclusion in the DRG rate for uncompensated care costs. The uncompensated care costs attributed to a particular hospital was borne only by that hos-

pital's patients. In 1987 New Jersey again amended the hospital rate setting system. Under the Amendments, hospitals throughout the state shared equally in the cost of uncompensated care. Thus, the hospital bill of each patient is increased by the same amount in order to compensate hospitals for uncompensated care costs. Currently, a hospital increases a patient's bill 19% for uncompensated care. The New Jersey Health Care Trust Fund then distributes the money collected for uncompensated care to each hospital according to that particular hospital's needs.

rate an amount necessary to recover the difference between the Medicare rate of payment and the DRG rate. These costs are borne by non-medicare patients.

Moreover, Chapter 83 allows the Commission to decrease hospital costs for certain classes of payors. In particular, the Commission may grant a "payor differential" if it is supported by a "quantifiable economic benefit such as the degree of promptness and volume of payment to the hospital." N.J.S.A. 26:2H–18b. Pursuant to this provision, the Commission has granted a 2.2% discount to plans such as Blue Cross. None of the Benefit Plans currently receive such a discount. Only the Carpenter's Union Trust Fund (the "Carpenter's Union"), has requested such a discount. The Commission has not yet reached a decision as to the Carpenter's Union's application.

In addition to the 2.2% discount the Commission grants an 11% discount to plans with open enrollment. Because the Benefit Funds must limit their enrollment to union members and their families, the Benefit Funds cannot receive this discount. The bills of patients who did not belong to plans that received these discounts were increased in order to supply hospitals with the reduced income they lost because of the discounts. N.J.A.C. 8:31B–3.39.

Regulations, promulgated in accordance with the rate setting scheme, contain an appeal process for individuals whose DRG costs exceed their total costs by $250.00. Individuals who have third party insurance that does not reimburse the hospital according to DRG rates or that contains a deductible are not eligible to appeal. Ac-

cordingly, none of the individual plaintiffs can avail themselves of the appeal process.

The Benefit Plans do not provide the same type of payments for hospital costs incurred by their members. For example, the District Council of Ironworkers of Northern New Jersey Welfare Fund (the "IWF") Benefit Plan covers 95% of the actual hospital costs incurred by its members.[5] The NYSA–ILA Welfare Plan, however, compensates the hospital for about 75% of the total fees charged to its participants. Still, other Benefit Plans pay 100% of the DRG charges.

Plaintiffs instituted their Second Amended Complaint against certain New Jersey entities and administrators employed by New Jersey who are associated with the rate setting provisions (the "State Defendants").[6] Plaintiffs also sued various hospitals (the "Hospital Defendants") (with the State Defendants collectively the "defendants"). The Hospital Defendants must charge DRG rates in order to maintain the licenses that permit the hospitals to provide health care.

In their complaint, plaintiffs allege that this Court must strike down New Jersey's hospital rate setting scheme for the following reasons: (1) the scheme is pre-empted by § 502(a) of ERISA, 29 U.S.C. § 1132(a), and by § 302(c) of the Taft–Hartley Act, 29 U.S.C. § 186(c)[7]; (2) it deprives plaintiffs of the due process and equal protection rights guaranteed to them under the Constitutions of the United States and the State of New Jersey; (3) it constitutes a taking of property without just compensation under the United States Constitution; (4) it imposes a special tax law in violation of the New Jersey Constitution; and (5) it

5. Prior to April 16, 1991, the IWF paid 95% of the DRG rate imposed by the hospitals. Concurrent with its decision to reimburse only 95% of actual hospital cost, the IWF instructed its members to submit only the 5% difference in total costs to the hospitals. Mandated by the Act the hospitals have begun collection procedures in state court to recoup the unpaid DRG charges. Following its decision to reimburse only 95% of total costs the IWF placed the difference between 95% of the DRG rate and 95% of total costs into an escrow account.

6. Specifically, plaintiffs named the DOH, the Commission, the Administrator of the New Jersey Health Care Trust Fund, the Department of Human Services Division of Medical Assistance and Health Services and the Commissioner of Health as defendants.

7. Plaintiffs have offered no support for their preemption claim brought under the Taft–Hartley Act. Moreover, plaintiffs concede that preemption under § 186(c) applies more narrowly than under § 502(a) of ERISA. Therefore, this Court rejects plaintiffs preemption claim under the Taft–Hartley Act.

improperly delegates taxing power to the Commissioner because it gives the Commissioner "unchecked power" to establish hospital rates.

In addition to contesting each of the allegations asserted by plaintiffs, the defendants contend that this Court has no authority to hear this case. First, the State Defendants assert that the Eleventh Amendment protects them from the instant lawsuit. Second, the defendants allege that if the hospital rates constitute a tax, the Tax Injunction Act prohibits this Court from hearing the instant motion.

## III. DISCUSSION

### A. State Immunity Under the Eleventh Amendment

■ The State Defendants allege that they have not consented to suit and therefore, the Eleventh Amendment forecloses any action against them. The Eleventh Amendment does not prohibit suits for prospective injunctive relief and declaratory relief against state agencies and state officials where plaintiffs contend that actions taken by these agencies and officials, in their official capacity, have violated the federal constitution or federal statutes. *Geis v. Board of Education of Parsippany–Troy Hills*, 774 F.2d 575, 580 (1985). This exception to immunity applies even if issuing the declaratory or injunctive relief would reduce state funds. *Edelman v. Jordan*, 415 U.S. 651–52, 94 S.Ct. 1347, 1358–59, 39 L.Ed.2d 662 (1974). Similarly, suits that seek injunctive relief and assert that the state exceeded powers granted to it by its own constitution are not prohibited by the Eleventh Amendment. *Capitol Industries–EMI, Inc. v. Bennett*, 681 F.2d 1107, 1120 (9th Cir.), *cert. denied*, 459 U.S. 1087, 103 S.Ct. 570, 74 L.Ed.2d 932 (1982).

■ Because plaintiffs seek solely prospective injunctive and declaratory relief, the Eleventh Amendment does not bar their action commenced against any State Defendant. Moreover, even if this Court's

ruling decreases funds available to the state with which they can help defray the costs of medical expenses of its citizens, this still does not foreclose this action against the State Defendants. Likewise, the Eleventh Amendment does not preclude plaintiffs' claim that the Legislature unconstitutionally delegated the taxing power to the Commission.

### B. Application of the Tax Injunction Act (the "TIA")

■ Before this Court can consider the merits of the motions before it, the Court must decide whether the TIA bars any of plaintiffs claims.

The TIA provides:

The district court shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1341. Accordingly, in order to determine whether an action falls under the TIA the Court conducts a two-step analysis. First, the Court must determine if the charge at issue constitutes a tax. If the expense is a tax, then the Court must decide whether the State provides a "plain speedy and efficient remedy." 28 U.S.C. § 1341 [8].

At the outset, this Court notes that the TIA clearly applies to the types of claims and relief that plaintiffs seek. First, it is well settled that actions for declaratory relief as well as for injunctive relief are barred by the TIA. *See Franchise Tax Board v. Alcan Aluminum, Ltd.*, 493 U.S. 331, 110 S.Ct. 661, 107 L.Ed.2d 696 (1990). Additionally, the TIA encompasses federal constitutional challenges to the imposition of a state tax. *See Hardwick v. Cuomo*, 891 F.2d 1097, 1100 (3d Cir.1989) (plaintiffs' equal protection challenge to imposition of non-resident tax barred by TIA).

Congress enacted the TIA in order to "prevent federal court interference with the assessment and collection of state tax-

---

**8.** The Third Circuit has held that the TIA is a jurisdictional statute. *Sipe v. Amerada Hess Corp.*, 689 F.2d 396 (3d Cir.1982). Hence, the Court cannot hear any matters that fall within the scope of the TIA.

es" by parties who brought suits in federal court to enjoin a state or local government's collection of taxes. *Hardwick*, 891 F.2d at 1105. Congress recognized that states had a "pressing need" to collect revenues. As a result, state and local governments "would compromise [a party's claim] by taking less than the tax due." *Tramel v. Schrader*, 505 F.2d 1310, 1315 (5th Cir. 1975).

The difficult question faced by this Court is whether any of the costs included in the DRG rate constitute a tax. Initially, this Court finds that it must conduct its analysis under federal and not state law. *Robinson Protective Alarm Company v. Philadelphia*, 581 F.2d 371, 374 (3d Cir.1978) (" '[T]ax under state law' in 28 U.S.C. § 1341 should be determined as a matter of federal law by reference to congressional policies underlying the Tax Injunction Act, rather than by adoption of state tax labels developed in entirely different legal contexts.").[9]

No bright-line exists between assessments which are "taxes under state law" and those which are not. Recently, the court in *Butler v. Maine Supreme Judicial Court*, 767 F.Supp. 17, 18 (D.Me.1991), concisely stated the accepted definition of "taxes." In general, "assessments imposed primarily for revenue-raising purposes are 'taxes,' while those levies assessed for regulatory or punitive purposes, even though they may also raise revenues, are generally not 'taxes.'" *Id.* (citations omitted).

The Third Circuit has followed this definition. For example, in *Robinson*, the Third Circuit held that an assessment of 5% of gross earnings levied upon alarm station companies who used underground wires constituted taxes. The Court examined the character of the assessments. It found that the taxes were "collected annually in a manner similar to other gross receipts levied." Moreover, it noted that the monies collected were "added to the public fisc rather than applied exclusively to contractual services owed central alarm station companies."[10] Thus, the court concluded that Philadelphia taxed the plaintiffs under the TIA. *See also Butler*, 767 F.Supp. at 17 (D.Me.1991) (state exacted tax from plaintiffs when it imposed $300 jury fee on plaintiffs in state court action. Fees collected were "funnelled into Maine's general fund [and not] applied directly to the costs of jury trials.").

The dictum announced by the Third Circuit supports the conclusion that if Philadelphia applied the revenue collected to the regulated industry, the Court would have held that Philadelphia did not tax the alarm station companies. *Cf. Rural Telephone Coalition v. F.C.C.*, 838 F.2d 1307 (D.C.Cir. 1988) (FCC order to allocate 25% of traffic sensitive costs from local telephone companies to long distance telephone did not impose a tax. Primary purpose of the ruling was not to raise revenue but only to regulate rates.); *Brock v. Washington Metropolitan Area Transit Authority*, 796 F.2d 481 (D.C.Cir.1986), *cert. denied, Washington Metropolitan Transit Authority v. Brock*, 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 494 (1987) (statute that mandated employers to contribute to special fund from which several types of workers compensation payments were made did not impose taxes on employers. Statute's primary purpose was to "regulate liability for industrial accidents" and not to finance the government's general programs. Fund was segregated from other fees collected.) *Head Money Cases*, 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884) (Duty on immigrants collected from shipowners and segregated into its own fund which was imposed in order to defray the expense of regulating immigration and for the care of

---

9. Accordingly, plaintiffs' argument that the "add-ons" constitute a tax because the Commission on Hospital Rates termed them as such is of no moment to this Court.

10. Plaintiffs argument that the DRG rates constitute taxes because matching funds collected from the federal government under the Medi-

care Program are placed in the public fisc is simply a red herring. This Court must only determine whether the costs included within the DRG rate constitute a tax. Money obtained by New Jersey from the federal government that are related to some of the DRG costs has no bearing on this analysis.

immigrants did not exact a tax from ship-owners but instead only implicated the Commerce Clause). ·

Guided by the dictum in *Robinson*, this Court holds that the contested costs included in the DRG rate do not constitute a tax. The state never uses the money collected from plaintiffs for the general welfare. Additionally, the fees collected are never intermingled in a general fund. Instead, the fees defray the costs that hospitals incur pursuant to state regulation of hospital costs. Hence, this Court finds the TIA does not apply. Accordingly, this Court has jurisdiction over plaintiffs' claims.

Courts in various circuits have found that special assessments collected by the government to fund specific programs constitute a tax under the TIA. For example, in *Tramel*, the Fifth Circuit held that a special street improvement assessment levied on plaintiffs who owned land which abutted the streets that the City wanted to improve constituted a tax. 505 F.2d at 1312. The court reasoned that to hold otherwise would defeat the purposes of the TIA. In particular, the court held a contrary finding would permit parties to "delay or to frustrate the revenue collection process by resorting to federal courts." *Id.* at 1316.

Similarly, the Sixth Circuit held that a state law which required "parolees to make monthly payments to a supervision fund and to a victim's compensation fund," imposed a tax on parolees. *Wright v. McClain*, 835 F.2d 143 (6th Cir.1987). The Sixth Circuit acknowledged that the funds collected were used only by the Corrections Department. *Id.* at 145. The Sixth Circuit reasoned, however, that the fees constituted revenue because they were used "[by the government] to defray the cost to the general public of monitoring and supervising the behavior of convicted offenders and to compensate, in some measure, victims of criminal misconduct." *Id.* Thus, the Court

concluded that even though the funds were earmarked for a particular use by the state they were taxes.

The decisions discussed above do not disturb the Court's holding. Unlike the cases cited above, the charges included in the DRG rate do not fund special programs financed by New Jersey. Instead, they allow hospitals regulated by New Jersey to meet their financial obligations. Therefore, the TIA is inapplicable to the action before this Court.[11]

### C. *ERISA Pre-emption*

■ Plaintiffs argue that ERISA pre-empts the method New Jersey utilizes for establishing hospital rates. Initially, plaintiffs contend that ERISA pre-empts Chapter 83's method of setting hospital rates, determining who is eligible to appeal DRG costs, and deciding who can receive a discounted rate, because these provisions "relate" to an employee benefit plan. Plaintiffs further allege that the charges included in the DRG rates for uncompensated care, Medicare, and appeals granted to individuals constitute taxes that are impermissible under an express provision of ERISA because they relate to an employee benefit plan.[12]

ERISA contains an explicit pre-emption provision. Section 514(a) of ERISA pre-empts state laws that "relate to any employee benefit plan." 29 U.S.C. § 1144(a) ("§ 514(a)"). The Supreme Court has consistently interpreted the pre-emption clause broadly. *See FMC Corp. v. Holliday*, 498 U.S. 52, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990) ("The pre-emption clause is conspicuous for its breadth. It establishes as an area of exclusive federal concern the subject of every state law that 'relates to' an employee benefit plan governed by ERISA."); *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 24 n. 26, 103 S.Ct. 2841, 2854 n. 26, 77 L.Ed.2d 420 (1983) ("ERISA's commodi-

---

**11.** Because this Court finds that costs included in the DRG rates are not taxes, this Court will not determine whether the TIA applies to actions brought under ERISA.

**12.** Because this Court finds that ERISA pre-empts New Jersey's method of setting hospital rates, regardless of whether the charges challenged by plaintiffs constitute a tax, this Court will not decide the tax issue.

ous pre-emption provision is virtually unique."). Accordingly the Supreme Court has refused to define "relate to" narrowly. Instead, the Supreme Court has announced:

A law relates to an employee benefit plan in the normal sense of the phrase if it has a connection with or reference to such a plan.

*Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987).

Guided by the broad language contained in the pre-emption clause, the Supreme Court has held that ERISA pre-empts a state law even where a state law affects ERISA indirectly or the law was not "specifically designed to affect such plans." *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 525, 101 S.Ct. 1895, 1907, 68 L.Ed.2d 402 (1981). Similarly, the Supreme Court has held that the pre-emption clause does not apply only to "state laws dealing with the subject matter covered by ERISA: reporting, disclosure, fiduciary responsibility and the like." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 97–98, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983). Moreover, ERISA pre-empts a state law even if the law "[is] consistent with ERISA's substantive requirements." *Metropolitan Life Insurance Co. v. Massachusetts,* 471 U.S. 724, 105 S.Ct. 2380, 2388–89, 85 L.Ed.2d 728 (1985) (citing) 103 S.Ct. at 2900–2901, or the law was enacted to "effectuate ERISA's underlying purposes." *Mackey v. Lanier Collection Agency & Service Inc.,* 486 U.S. 825, 108 S.Ct. 2182, 2185, 100 L.Ed.2d 836 (1988).

In *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 484, 112 L.Ed.2d 474 (1990), the Supreme Court recently affirmed the broad reach of ERISA. In *Ingersoll,* the defendant contended that § 514(c)(2) of ERISA limited the scope of § 514(a). Section 514(c)(2) provides:

The term State includes a State, any political subdivisions thereof, or any agency or instrumentality of either which *purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans* covered by this subchapter. 29 U.S.C. § 1144(c)(2).

(Emphasis added). Based on ERISA's definition of "State," the defendant in *Ingersoll* concluded that § 514(a) only applies to state laws that "affect plan terms, conditions, or administration [of an ERISA plan]."

The Supreme Court, however, rejected this argument. First, the Supreme Court explained that Congress expanded the definition of state in order to enlarge the grasp of ERISA. Hence, defendant's restrictive reading of § 514(a) would defeat Congress's purpose. Second, the Supreme Court concluded that if Congress intended to restrict § 514(a) in the manner proposed by defendant it would have included the limiting language in § 514(a) itself. *Id.* Therefore, the Supreme Court refused to narrow the reach of the plain meaning of the language contained in § 514(a).

The Supreme Court's broad reading of ERISA's pre-emption clause stems not only from the plain meaning of the provision itself, but also from the legislative history of ERISA. Specifically, Congress rejected a pre-emption clause that only "appli[ed] to state laws [which] relat[ed] to the specific subjects covered by ERISA." *Shaw,* 103 S.Ct. at 2900; *FMC,* 111 S.Ct. at 408. Similarly, Congress excluded a state's "generally applicable criminal laws" from preemption. *Id.* Such an exclusion would have been unnecessary if Congress intended § 514(a) to apply only to "state laws dealing specifically with ERISA plans." 103 S.Ct. at 2900; 111 S.Ct. at 408.

Finally, the legislative history reveals that Congress enacted ERISA in order to give federal authorities "sole power to regulate the field of employee benefit plans." *Pilot Life Ins. Co.,* 107 S.Ct. at 1552 (quoting) 120 Cong.Rec. 29197 (1974). Accordingly, Congress enacted a broad pre-emption clause in order to "eliminate the threat of conflicting or inconsistent State and local regulation of employee benefit plans." *Id.* (quoting) 120 Cong.Rec. at 29933.

Following the dictates of Congress, the Supreme Court has held that ERISA superseded state laws that forced a benefit plan to structure benefits in a specific manner. Similarly, the Supreme Court has invalidat-

ed state laws that could subject an ERISA plan to inconsistent state regulations. As noted above, whether a state law mentioned ERISA plans was not a critical factor in the Supreme Court's decision.

For example, in *Alessi*, 451 U.S. at 508–09, 101 S.Ct. at 1898, New Jersey forbade reducing retirement benefits or payments by the amount of money a person received under worker's compensation. The Supreme Court held that ERISA pre-empted New Jersey's law. In particular, the Supreme Court found that New Jersey's law impermissibly "eliminate[d] one method for calculating pension benefits." As a result, New Jersey's regulation would force a pension plan either to change its manner for computing benefits for all plans both within and outside New Jersey or to require the plan to calculate benefits for New Jersey employees in a manner different from the manner used for employees outside New Jersey. Moreover, the Supreme Court reached its conclusion irrespective of the New Jersey law's beneficial purposes. Additionally, the Supreme Court held that it made no difference that "New Jersey intrudes indirectly through workers compensation rather than directly through a statute called pension regulation." Importantly, although the Supreme Court recognized that New Jersey's law constituted an exercise of its police powers, the Court still held that ERISA pre-empted the law.

Likewise, in *FMC*, 111 S.Ct. at 406, the Supreme Court held that ERISA pre-empted Pennsylvania's anti-subrogation law.

Pennsylvania's law prohibited a party from subrogating his or her tort recovery "in an action arising out of the maintenance or use of a motor vehicle" to any plan that paid the party benefits related to the accident. *Id.* Contrary to Pennsylvania's law, the benefit plan at issue in *FMC* provided that a participant would reimburse the plan with any recovery obtained from a third party.

In reaching its conclusion, the Supreme Court found that Pennsylvania's law restricted the way in which the plan could provide benefits. Additionally, the Court reasoned that Pennsylvania's statute would subject the plan to inconsistent regulations. This would "frustrate plan administrators continuing obligation [under ERISA] to calculate uniform benefit levels nationwide." Therefore, the Supreme Court held that Pennsylvania's anti-subrogation law was unenforceable.[13] *See also Shaw*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (ERISA pre-empted New York law that mandated benefits for pregnancy. Law forced ERISA plans to structure benefits in a particular manner and subjected plans to inconsistent regulations).

Following the Supreme Court's interpretation of § 514(a), the Eighth Circuit held in a recent decision that ERISA pre-empted Arkansas' general assignment statute. The Arkansas statute made no reference to an ERISA plan. Instead, the statute provided:

**13.** The Supreme Court also found that Pennsylvania's law related to ERISA because it referenced employee welfare plans. In particular, the statute encompassed "any program group contract or other arrangement for payment of benefits." It further defined the aforementioned terms as "including but not limited to, benefits payable by a hospital plan corporation or a professional health service corporation." (Emphasis added). Hence, the Supreme Court found that Pennsylvania's law referenced employee benefits plans even though the statute (1) never explicitly mentioned such plans and (2) simply failed to exclude them from a catchall provision.

Plaintiffs contend that ERISA pre-empts the DRG scheme because the policy that contains the appeal procedure and Chapter 83 itself reference employee benefit plans. In particular, the

appeal policy "denies the right to appeal a hospital bill to any plan participant if the 'third-party payer (commercial insurance, self-funded union, etc.) requests an appeal on the basis of excessive charges'; or if the 'third party payer (commercial insure, self-funded union, etc.) does not reimburse the hospital on the DRG price per case'. Moreover, in order to receive funds for uncompensated care a hospital must ask a patient whether he or she is covered by insurance including whether such coverage is from a 'union welfare plan'."

Defendant's argue that these provisions do not refer to employee benefit plans, but merely use them as examples. In light of the *FMC* Court's opinion, defendants' argument fails, and this Court holds that the explicit reference to ERISA plans contained in the Chapter 83 provides further support for ERISA preemption.

all bonds, bills, notes, agreements, and contracts, in writing, for the payment of money or property, or for both money and property, shall be assignable.

Ark.Code Ann. § 4–58–102. The benefit plan at issue forbade assignment of benefits unless the benefit plan approved the assignment. Accordingly, the plan conflicted with Arkansas' statute that provided for unconditional assignment of such benefits.

In reaching its conclusion, the court noted that the statute negated a provision of the benefit plan. More importantly, the Eighth Circuit found that the law would subject the plan to inconsistent regulations throughout the country. Equally significant was the Eighth Circuit's opinion that the statute affected relationships among primary ERISA entities. Primary ERISA entities are—the employer, the plan, the plan fiduciaries, and the beneficiaries. In particular, the Eighth Circuit reasoned that the "assignment statute takes from the claims administrator who is a plan fiduciary, and gives to the beneficiaries control over who should receive payment of ERISA-plan welfare benefits." [14]

Although the Supreme Court has interpreted § 514(a) broadly, the Court has cautioned that "some state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to the plan.'" *Shaw*, 103 S.Ct. at 2901 n. 21. Thus, ERISA would not pre-empt "a generally applicable statute that makes no reference to, or indeed functions irrespective of, the existence of an ERISA plan." *Ingersoll–Rand*, 111 S.Ct. at 483; *see also Aetna Life Ins. Co. v. Borges*, 869 F.2d 142 (2d Cir.), *cert. denied*, 493 U.S. 811, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989).

In *Mackey*, the Supreme Court held that ERISA did not pre-empt Georgia's garnishment statute that applied to any Georgia citizen, even when applied to benefits of participants in plans covered by ERISA. The fact that the law caused administrative burdens to ERISA plans did not suffice to pre-empt Georgia's garnishment statute.

Similarly, in *Aetna*, the court concluded that ERISA did not pre-empt Connecticut's abandoned property laws. Aetna Life Insurance Company provided health and accident insurance. Often, Aetna would approve a claim for benefits, but the beneficiary would fail to collect the benefits. *Id.* at 143–44. The court held that ERISA's pre-emption clause did not prevent Connecticut from recovering the uncollected benefits. Connecticut's escheat law applied to all types of abandoned property, and it was insignificant that the abandoned property in this particular case consisted of the benefits provided under a plan covered by ERISA. *Id.* at 147–48.

Significantly, the law did not obligate the plan to cover certain benefits nor did it interfere with the calculation of benefits, the economic impact on ERISA plans did not threaten the purpose of ERISA to subject the plans to "national uniform supervision." *Id. See also Benefax Corporation v. Wright*, 757 F.Supp. 800 (W.D.Ky.1990) (Even if Georgia licensing statutes that applied to administrators related to ERISA plans, affect would be too remote or tenuous for ERISA to pre-empt the statute. The statute applied to any administrator regardless of whether he or she administered a plan qualified under ERISA and "[did] not affect the relationship between principal ERISA entities other than to determine who can or cannot serve as an administrator.").

Additionally, the Supreme Court has held that laws that relate solely to benefits and not to benefit plans are not pre-empted by § 514(a). Accordingly, in *Ft. Halifax Packing Co. Inc. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), the Supreme Court refused to find that ERISA pre-empted a Maine statute. The statute required an employer to pay employees a one time severance payment in the event of a plant closing. The Court ruled that the statute referred to a benefit and not to a benefit plan.

---

**14.** In its decision the Eighth Circuit equated an effect on primary ERISA entities with the Supreme Court's often mentioned effect on an ERISA benefit plan's structure.

In so doing, the Court noted that the severance payment did not "establish a benefit plan," nor did it force an employer to "maintain a benefit plan." Further, the Court explained that the one time severance payment did not subject any benefit plan to inconsistent regulations. Finally, the Court concluded that the one time payment did not create continuing administrative hardships on an employee benefit plan. Therefore, the Court determined that ERISA did not pre-empt Maine's statute.

Plaintiffs correctly argue that the contested provisions in Chapter 83 relate to ERISA and are therefore pre-empted by § 514(a). Chapter 83 both forces the benefit plans to structure benefits in a particular manner and subjects the benefit plans to inconsistent regulations. The fact that the these provisions do not mention benefit plans directly and do not regulate the terms and conditions of such plans explicitly, has no bearing on this Court's findings.

In particular, the charges included in the DRG rate for uncompensated care, the shortfall for Medicare, and the discounts granted to certain payors, force the Benefit Plans to incur costs for the benefit of others if the Benefit Plans provide benefits to cover total hospital costs. The Benefit Plans themselves are not allowed to disburse funds to anyone other than a plan participant. As a result, Benefit Plans that are mandated to pay total hospital costs must disregard their express purposes.

Furthermore, in states in which hospital rates do not include costs for others, the Benefit Plans can abide by their express purposes. Hence, the plans are subjected to inconsistent regulations. Accordingly, plan members in different states receive different and disproportionate benefit amounts depending whether a given state's hospital rate setting policy includes charges beyond "actual hospital costs." Consequently, this Court finds that these provisions and the regulation promulgated thereunder frustrate ERISA's purpose of subjecting benefit plans to uniform federal regulations.

Additionally, ERISA itself forbids benefit plans from paying benefits for anyone other than a plan beneficiary. This proscription further compels this Court to find ERISA pre-empts Chapter 83's contested provisions and the regulations promulgated thereunder.[15] *See McLaughlin v. Rowley,* 698 F.Supp. 1333, 1339 (N.D.Tex.1988) (ERISA pre-empted Texas Usury statute that prevented plan trustees from charging more than 10% interest on loans in light of ERISA provision that compelled "plan fiduciaries to obtain market rates on plan investments."); *Arkansas Blue Cross & Blue Shield v. St. Mary's Hospital, Inc.,* 947 F.2d 1341, 1349 (8th Cir.1991) (ERISA provision that prohibited assignment or alienation of ERISA plan benefits weighed in favor of pre-empting Arkansas law that unconditionally allowed assignment of any contract).

Moreover, because the purpose of the Benefit Plans and ERISA itself foreclose the plans from paying DRG rates, the participants in the plans lose any right to appeal the cost of their hospital bills. Again, only if the Benefit Plans choose to ignore the dictates of ERISA and pay DRG rates can the beneficiaries avail themselves of an appeal. This lack of parity with other hospital payors arises because of a

---

**15.** Defendants erroneously argue that Chapter 83 affects hospitals, not benefit plans. According to defendants, Chapter 83 forces hospitals to charge certain rates and does not foreclose the Benefit Plans from covering any portion of a participant's hospital bill. In light of the express purposes of both the Benefit Plans themselves and the dictates of ERISA, both of which prevent a Benefit Plan from covering costs of anyone except plan beneficiaries, this argument is at the least misleading. Moreover, defendants' argument simply ignores the Supreme Court's finding that ERISA pre-empts state laws that indirectly affect benefit plans.

Furthermore, defendants contend that Chapter 83 does not subject the Benefit Plans to inconsistent regulations because inconsistencies currently exist in the rates set by hospitals in various states. This argument is spurious. Plaintiffs are not advocating that hospitals in each state set identical rates. Instead, they argue that a state cannot include certain types of costs within its hospital rates. By including these type of costs, which other states might not include, New Jersey subjects Benefit Plans to inconsistent regulation.

Benefit Plan's administration and it is this relationship that undergirds the argument in support of pre-emption. Moreover, by virtue of their status, the Benefit Plans cannot qualify for an open enrollment discount. Importantly, the Benefit Plans must subsidize the recipients of these discounts. This further supports ERISA pre-emption.

Additionally, as opposed to the statutes at issue in both *Mackey*, and *Aetna Life Insurance*, the contested provisions in Chapter 83 are not simply tenuously connected to the Benefit Plans and which only affects the Benefit Plans by increasing their costs. Contrastingly, the disputed provisions affect the structure of the Benefit Plans themselves. Moreover, this Court finds that unlike the Supreme Court's decision in *Fort Halifax*, the offending provisions in Chapter 83 and the corresponding regulations do not simply constitute a benefit that forces the Benefit Plans to make a one time payment. Instead they subject the Benefit Plans to "ongoing administrative hardship." For these reasons, this Court finds that Chapter 83 pre-empts ERISA.

Defendants argue, however, that ERISA does not pre-empt these provisions because they constitute a law of general application that has a too "tenuous, remote, or peripheral" effect on an employee benefit plan. Defendants rely primarily on *Rebaldo v. Cuomo*, 749 F.2d 133 (2d Cir.1984), to support their contention. In *Rebaldo* the Second Circuit held that § 514(a) did not pre-empt a New York statute that exempted small insurance funds which excluded employee benefit plans under ERISA from negotiating discounts with hospitals. Insurers such as Blue Cross were allowed to negotiate with hospitals for the discounts at issue.

The Second Circuit held that New York's law was solely a law of general application that failed to "affect the structure, administration or type of benefits provided by an ERISA plan." According to the court, the "mere fact that statute ha[d] some economic impact on the plan d[id] not require that the statute be invalidated."

As opposed to the statute at issue, the contested provisions in Chapter 83 do not only have an economic effect on ERISA plans. Instead, these provisions force Benefit Plans to structure benefits in a particular manner and subjects Benefit Plans to inconsistent regulations. Therefore, under the standard announced by *Rebaldo*, this Court would find that ERISA pre-empts Chapter 83.

Moreover, in light of recent decisions, the underlying rationale stated by the *Rebaldo* court is at the very least subject to question. In particular, the *Rebaldo* court reasoned that a "state law must purport to regulate the terms and conditions of employee benefit plans to fall within the pre-emption provision." As discussed above, the Supreme Court in *Ingersoll* faced this precise reading of § 514(a) and rejected it.

The *Rebaldo* court concluded that "containment of hospital costs is an exercise of police powers which should not be superseded by federal regulations unless there was a clear intent of Congress." In *Gilbert v. Burlington Industries, Inc.*, 765 F.2d 320, 327 (2d Cir.1985), *aff'd*, 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 558 (1986), the Second Circuit revisited the weight to be given in an analysis under § 514(a) to a state's exercise of its police powers and attributed less weight to this factor than allotted to it by the *Rebaldo* court.

Specifically, the court in *Gilbert* stated, "in addition to being an exercise of traditional police power [a state law] must also affect the plan in too tenuous remote or peripheral a manner to warrant a finding that the law relates to the plan." Importantly, the *Gilbert* court pre-empted a state law that constituted an exercise of the state's traditional police powers because it found that the state law did not have a "remote or tenuous connection" to ERISA. *Id.*

In *Boise Cascade Corp. v. Peterson*, 939 F.2d 632, 638 (8th Cir.1991), the court similarly held that the minimum ratio rule that regulated the ratio of pipe-fitters to apprentices working on Minnesota job-sites and which had been in effect since 1947 was pre-empted by ERISA. The Court spe-

cifically found that the state passed the minimum ratio law as an exercise of its police powers. In particular, the court noted that the state enacted the statute at issue in order to protect its citizens' safety. Because the law failed to affect the plan solely in a "tenuous, remote or peripheral manner," however, the court held ERISA pre-empted the statute. *See also Arkansas Blue Cross & Blue Shield*, 947 F.2d at 1351 ("[W]e do not believe that whether the assignment statute is an exercise of traditional state authority favors or disfavors a finding of pre-emption"). Given that subsequent decisions have attacked *Rebaldo*'s reasoning, this Court accords *Rebaldo* limited weight.

Other court decisions subsequent to *Rebaldo* that involved hospital rate setting schemes have found that ERISA pre-empted the scheme at issue. For example, in *Bricklayers Local No. 1 Welfare Fund v. Louisiana Health Insurance*, 771 F.Supp. 771, (E.D.La.1991), the court held that ERISA pre-empted the statute that created the Louisiana Health Insurance Association (the "Association"). The Association administered and collected funding for a catastrophic health insurance program. The Association charged a fee to any "insurer," "insurance arrangement" or "self insurer" that provided medical benefits. A self-funded ERISA plan alleged that ERISA pre-empted the Association from collecting the fee for the catastrophic health insurance program.

The court rejected defendant's arguments that the statute was too tenuously connected to ERISA to warrant pre-emption. In so doing, the court reasoned that the plan "indisputably affects the relations among the principal ERISA entities" be-

cause it compelled the ERISA plans to pay certain types of benefits. Moreover, the statute mandated that the ERISA plan pay costs of people who were not beneficiaries of the plans. This further supported the court's finding. As in *Bricklayers*, the DRG scheme forces the Benefit Plans to structure themselves in a certain manner, and to pay hospital costs that accrue to non-beneficiaries. Hence, the same reasons that compelled the *Bricklayers Local* court to pre-empt the state statute, apply to the instant case.

Once again, in *United Health Services Inc. v. Upstate Administrative Services Inc.*, 151 Misc.2d 783, 573 N.Y.S.2d 851 (Sup.Ct. Broome Cty.1991), the court found that ERISA pre-empted New York's rate setting scheme. Under this scheme, plans covered by ERISA paid a DRG rate while other plans paid actual cost. In finding that the relationship between ERISA and the plan at issue was not too tenuous, the court held that the statute subjected the ERISA plans to inconsistent regulations. *Cf. General Motors Corp. v. Caldwell*, 647 F.Supp. 585 (N.D.Ga.1986) (statute that regulated rates for prescriptions pre-empted by ERISA. Although not explicitly directed at ERISA plans, statute created an administrative scheme with which ERISA regulated plans had to comply).

Here, as in *United Health Services*, the statute at issue would result in subjecting the Benefit Plan to inconsistent regulations. Such inconsistencies would thwart the purposes of ERISA to create benefit plans subjected to uniform regulation. Thus, as in *United Health Services*, this Court finds that ERISA pre-empts certain costs and methods included in New Jersey's hospital rate setting scheme.[16]

---

**16.** Defendants argue that both *Bricklayers Local No. 1* and *United Health Upstate Administrative Services* are distinguishable from the case at bar because the state statute at issue in those cases directly affected the ERISA plans. In light of the previous discussion that the Supreme Court has refused to limit ERISA pre-emption to state laws that directly affect ERISA benefit plans, this Court finds that defendant's argument has no merit.

Additionally, defendants cite *Bonser v. New Jersey*, 605 F.Supp. 1227, 1232 (D.N.J.1985), as

in support of their position. In *Bonser* the court opined that ERISA probably would not pre-empt New Jersey's system for setting hospital rates according to DRG category and not according to actual cost. Defendants' reliance on *Bonser* is misplaced for two reasons. First, the *Bonser* decision pre-dated the Supreme Court's most recent pre-emption opinion. These opinions further expand § 514(a)'s scope. Second, the costs added to the DRG rate for indigent care, bad debts, and the medicare cost shift were not at issue in *Bonser*.

## D. *Constitutional Attacks*

Plaintiffs further allege that the manner in which hospital rates are set under Chapter 83 violates both the United States's Constitution and the Constitution of the State of New Jersey. Specifically, plaintiffs contend Chapter 83 deprives them of their procedural and substantive due process rights and the equal protection rights guaranteed to them under the Constitutions of the United States and the State of New Jersey; it constitutes a taking of property without just compensation under the United States Constitution; it imposes a special tax law in violation of the New Jersey Constitution; and it violates the New Jersey Constitution because it delegates taxing power from the Legislature to the Commissioner.

### 1. Denial of Equal Protection

■ Plaintiffs assert two ways in which the provisions of Chapter 83 violate their equal protection rights under both the United States Constitution and the Constitution of the State of New Jersey. First, plaintiffs argue that the costs included in the DRG rate for indigent care, hospitals' bad debts and, costs for the Medicare shortfall violate the equal protection clause because these costs are borne only by hospital patients and not by all New Jersey's residents. Second, plaintiffs contend that the 11% discounts which are only available to plans with open enrollment and, are therefore, not available to the Benefit Plans denies plaintiffs their equal protection rights.

A plaintiff who challenges a statute or regulation that neither regulates a suspect class nor burdens the exercise of a fundamental right has a heavy burden. A Court must uphold a statute as long as it is rationally related to a legitimate governmental interest. *New Orleans v. Dukes*, 427 U.S. 297, 302, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976).

In determining whether legislation has a rational relation to a legitimate governmental interest, a Court must "accord wide latitude [to states] in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude." A court cannot "judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *Id.* Only the "wholly arbitrary act" can be deemed irrational. *Id.*

Consistently, courts have upheld regulations that disparately affect different classes of payors when challenged under the equal protection clause. For example, in *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 2892–94, 49 L.Ed.2d 752 (1976), the Supreme Court upheld a federal statute that disparately charged different classes of mine workers for medical costs incurred by employees and former employees who contracted black lung disease. Under the statute, a miner's former employer had to pay the miner's medical expenses.

The employers argued that the statute denied them of due process of law [17] be-

---

**17.** The Supreme Court has declared that the due process clause of the Fifth Amendment contains an equal protection component applicable to actions in which a plaintiff challenges a United State's statute on the ground it treats different categories of people unfairly. The analysis under the due process clause is identical to the analysis under the equal protection clause of the Fourteenth Amendment. Plaintiffs contend that Chapter 83 arbitrarily discriminates among types of payors. In particular, plaintiffs declare that under Chapter 83 uninsured payors are charged "actual cost" but insured payors must pay the DRG cost that includes costs for the benefit of others. Plaintiffs assert that this violates their due process rights. Because plaintiffs challenge a state statute, plaintiffs should

have asserted this cause of action under the equal protection clause.

Moreover, plaintiffs erroneously contend that all non-insured patients pay actual cost. Rather, only uninsured payors who successfully appeal pay actual costs. Therefore, this Court will construe plaintiffs claim as an equal protection challenge to the appeal process' differential treatment of insured and uninsured patients.

Even if plaintiffs alleged that the DRG costs violated their substantive due process rights because the charges deprived them of their property, this Court would still find that plaintiffs' claim was without merit. A substantive due process claim parallels a claim brought under the equal protection clause. In cases that do not implicate fundamental rights, the court

cause it "spread costs in an arbitrary and irrational manner by basing liability upon employment relationships, rather than taxing all coal mine operators presently in business." 428 U.S. at 19; 96 S.Ct. at 2894. According to the employers, such an irrational statute compelled an operator who presently employed fewer people to be saddled with a liability which was disproportionate to the size of the employers current workforce. As a result, newer employers received a competitive edge and the older employers were unfairly apportioned a greater burden.

In holding that the statute had a rational basis, the Supreme Court gave great deference to Congress. In particular, the Court stated:

> [I]t is for Congress to choose between imposing the burden of inactive miners' disabilities on all operators, including new entrants and far-sighted early operators who might have taken steps to minimize black lung dangers, or to impose that liability solely on early operators whose profits may have been increased at the expense of their employees' health.... It is enough to say that the Act approaches the problem of cost spreading rationally; whether a broader cost-spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimension.

See also *United States v. Sperry Corporation*, 493 U.S. 52, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989) (due process challenge to statute that charged a fee to claimants who successfully recovered an award before the Iran–United States Claims Tribunal failed. Court found rational basis existed to compel only those who received a payment from the Tribunal to help subsidize the costs of running the Tribunal).

In the present case, the New Jersey Legislature has articulated a rational basis for the differential treatment given to plaintiffs. The Legislature has a rational basis for charging the cost of uncompensated care to plaintiffs. In accordance with its power to provide for the general welfare of its citizens, the Legislature has mandated that hospitals must provide care to anyone, regardless of ability to pay for the services. In order to follow this directive, Chapter 83 requires the DRG rate to include a charge for uncompensated care. Moreover, as part of its obligation to provide for the welfare of its citizens, one of Chapter 83's purposes is to ensure the economic solvency of its hospitals. Charging plaintiffs for uncompensated care is rationally related to both of these goals.

Although plaintiffs argue that this cost should be apportioned among all residents of New Jersey and not only among those who use the hospitals, this does not amount to a constitutional challenge. It is rational for New Jersey to force those who benefit from using the hospitals to bear the costs incurred by the hospitals for uncompensated care. Similarly, in order to provide for its citizens general welfare and to ensure the fiscal solvency of hospitals, it is rational for the Legislature to give discounts to plans that allow any citizen to enroll and to compel plans that do not have open enrollment to subsidize these discounts.

Finally, this Court finds that New Jersey's appeal procedure that effectively allows only uninsured patients to appeal the DRG charges that exceed the total cost by at least $250 has a rational basis. The appeal policy permits those who are more severely affected by hospital charges to obtain some financial relief. Thus, the process allows the State to provide for its citizens general welfare without overburdening a hospital's ability to remain fiscally solvent. For these reasons, this Court holds that plaintiffs' claims brought under

must determine whether the regulation "is rationally related to furthering a legitimate state interest." *Meier v. Anderson*, 692 F.Supp. 546, 552 (E.D.Pa.1988), *aff'd*, 869 F.2d 590 (3d Cir. 1989). As discussed in more detail below, the hospital rate setting system is rationally related to furthering New Jersey's interest in containing hospital costs, ensuring hospitals remain financially solvent, and providing health care for its citizens. Therefore, a substantive due process claim would fail.

the Equal Protection Clause of the Federal Constitution have no merit.[18]

## 2. Taking of Property Without Just Compensation [19]

██ Plaintiffs further argue that the inclusion of certain costs in the DRG rate deprive plaintiffs of their property without just compensation. Consequently, plaintiffs contend these charges violate their rights under the Fifth Amendment which are applied to the states through the Fourteenth Amendment.

The Supreme Court has ruled that a statute or regulation which forces a person to expend money for the benefit of another does not constitute a physical taking of property. *See Sperry*, 493 U.S. at 60, 110 S.Ct. at 393; *Colorado Springs Production Credit Association v. Farm Credit Administration*, 758 F.Supp. 6, 12 (D.D.C. 1991). Accordingly, a regulatory takings analysis, and not a *per se* analysis applies to the regulations in the case at bar. *Id.* at 12.

There is no "set formula" that a court can apply to determine whether a regulation violates the Takings Clause. *Connolly v. Pension Guaranty Corp.*, 475 U.S. 211, 222, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986). Instead, courts determine whether a regulation violates the Takings Clause on an "ad hoc basis," in which the court focuses on "[the facts and] circumstances of each particular case." *Id.* The Supreme Court has announced a three-prong test to assist courts to decide whether a regulation constitutes a taking. Under this analysis the court considers:

(1) the character of the governmental action;

(2) the economic impact of the regulation on the claimant; and (3) the extent to which the regulation has interfered with investment backed expectations.

*Id.* 106 S.Ct. at 1026 (citing) *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).

The regulation at issue in *Connolly* required any employer who withdrew from a multi-employer fund to pay a fee that was related to an employers share of the plans "unfunded vested benefits." The regulation mandated such a fee in order to ensure that pension plans would be financed adequately.

Guided by this analysis, the *Connolly* court found that the federal regulation did not violate the takings clause. As to the type of governmental action, the Court found that this factor merited a finding that the regulation did not constitute a

---

**18.** The courts apply the same analysis to claims that arise under New Jersey's equal protection clause as the courts apply to the equal protection clause contained in the Fourteenth Amendment. *See In Re C.V.S. Pharmacy Wayne*, 116 N.J. 490, 498, 561 A.2d 1160 (1989), *cert. denied, Consumer Value Stores v. Board of Pharmacy*, 493 U.S. 1045, 110 S.Ct. 841, 107 L.Ed.2d 836 (1990) ("Legislation [will be] sustained if it is not arbitrary, capricious, or unreasonable, and the means selected bear a rational relationship to the legislative objective." ... "For a statute to be rationally related to the public interest, it need not be the best or only method of achieving the legislative purpose.") In fact, the New Jersey Supreme Court held that discounts given to Blue–Cross under the previous hospital rate setting scheme did not deny plaintiffs, a union health plan, their equal protection rights. Moreover, a due process analysis under the New Jersey Constitution follows an equal protection analysis. Therefore, plaintiffs' equal protection claims and due process claims fail under New Jersey's constitution for the same reasons that they are unfounded under the United States Constitution.

Additionally, New Jersey applies an equal protection analysis to determine whether a tax violates the State Constitution's prohibition against the levy of special taxes. *See Vreeland v. Byrne*, 72 N.J. 292, 298–99, 370 A.2d 825 (1977). Hence, in light of the above discussion even if under New Jersey law, the challenged costs were taxes, this Court would find that New Jersey has not imposed a special tax.

**19.** The Hospital Defendants have instituted a counterclaim in which they allege that failing to increase hospital rates to compensate hospitals for the shortfall they face would constitute a taking of their property under both the United States Constitution and New Jersey's Constitution. Assuming that plaintiffs have presented a ripe controversy to this Court, this Court finds that under the analysis announced by *Connolly*, losing their expected revenues does not constitute a taking of the Hospital Defendants' property. Likewise, this Court finds that the State Defendant's inaction would not constitute a taking under the New Jersey Constitution.

taking. Specifically, the Court found that the "Government [did] not physically invade or permanently appropriate any of the employer's assets for its own use." Instead, the government enacted the statute to protect participants in ERISA plans. The Court then concluded that "[such] an interference that adjusts the benefits and burdens of economic life to promote the common good [did] not constitute a taking." *Id.*

The Court then acknowledged that the regulation permanently deprived the plaintiff of any money it required him to pay. Nonetheless, the Court did not find that the regulation imposed a severe economic impact on plaintiffs. In so doing, the Court noted that the assessment on the employer related to the plans to which he had contributed. *Id.*

Finally, the Court found that the regulation failed to interfere with any of plaintiffs' investment backed expectations. In particular, the Court declared that pension plans were and had been regulated heavily by the Government. In light of the Court's findings, the Court held that the regulation did not violate plaintiffs' rights under the takings clause.

Similarly, in *Meier v. Anderson,* 692 F.Supp. 546 (E.D.Pa.1988), the court found that the provision in Pennsylvania's Health Care Services Malpractices Act (the "Act") that established the Medical Profession Liability Catastrophe Loss Fund (the "CAT Fund") did not violate the takings clause. The Act required doctors to maintain malpractice insurance and to pay an annual surcharge to the CAT fund. This surcharge amounted to between 5% and 50% of a doctor's gross income and was calculated as a percentage of the Doctor's cost for malpractice insurance. *Id.* at 548–49.

The Legislature enacted the surcharge to ensure adequate compensation to malpractice victims. The plaintiffs alleged that the surcharge violated their constitutional rights under the takings clause because it "placed the burden of compensating malpractice victims" on all doctors instead of on society in general or doctors who engaged in malpractice.

In reaching its decision, the court followed the analysis applied by the *Connolly* court. First, the court examined the type of action engaged in by the government. As in *Connolly,* the court found that Pennsylvania did not "physically invade or permanently appropriate any of plaintiffs' assets for its own use" but instead enacted a regulation that shifts economic burdens in order to "promote the common good." *Id.* at 554–56.

Second, the court noted that as in *Connolly,* the Act permanently deprived the plaintiffs of the money that plaintiffs had to pay pursuant to the statute. The court further reasoned, however, that the regulation did not impose an arbitrary assessment upon plaintiffs. Instead, the assessment consisted of a percentage of a plaintiff's malpractice insurance costs. Furthermore, the court noted that plaintiffs benefitted from the Act. In particular, the Act excluded them from liability for malpractice claims that exceeded their insurance contributions. *Id.*

Finally, the court concluded that plaintiffs had no reasonable investment backed expectations. First, the court explained that if the Legislature had not passed the statute, plaintiffs would have expected to incur costs for a malpractice judgment entered against them. Second, the court held that the state had regulated medicine over a long period of time. In view of these considerations, the court held the Act did not violate the takings clause. *Id.*

In the instant case, as in the cases discussed above, plaintiffs have failed to show that the inclusion of certain costs in the DRG rate constitutes an unconstitutional taking of their property. New Jersey has not "physically invaded or permanently appropriated for its own use any of plaintiffs' assets." Instead, New Jersey has enacted Chapter 83 in order to promote the public good. Simply because this statute and the regulations promulgated under it, "adjusts the benefits and burdens of economic life," it is not transformed into a taking of plaintiffs' property.

Furthermore, even though the statute permanently deprives plaintiffs of the costs

associated with the DRG charges, this does not weigh in favor of this Court finding a taking. In particular, as in both *Connolly* and *Meier*, the amount of money exacted from plaintiffs is not determined on an ad hoc basis. The amount of money charged is directly related to the individual plaintiffs' hospital bill. Moreover, plaintiffs benefit from the Act for two reasons. First, it not only allows hospitals to maintain a higher level of care, but in some cases it also allows them to continue to provide health care. Moreover, the regulations would allow the individual plaintiffs to receive quality health care if they ever were unable to afford their hospital bills.

Finally, plaintiffs could not have had a reasonable investment backed expectation. New Jersey has regulated hospitals and hospital rates for many years. Moreover, even if New Jersey did not enact Chapter 83, hospitals would still charge plaintiffs for uncompensated care and the medicare differential so they could comply with their statutory obligation to provide hospital care for everyone regardless of that person's ability to pay. For these reasons, this Court finds that plaintiffs have failed to show that the costs included in the DRG rate rise to the level of an unconstitutional taking of property.[20]

### III. CONCLUSION

For the reasons expressed above, this Court grants defendants' motion for summary judgment as to defendants' state and federal constitutional claims. Further, this Court grants plaintiffs' motion for summary judgment as to the ERISA pre-emption claim. In particular, this Court finds ERISA pre-empts the sections of Chapter 83 and the corresponding regulations that mandate uncompensated care, allow the Medicare differential, allow the payor discounts, and allow for appeals of the DRG rate charged to a particular patient.

An appropriate order is attached.

### ORDER

In accordance with the Court's Opinion filed herewith,

It is on this 27th day of May, 1992,

ORDERED that ERISA pre-empts the sections of Chapter 83, and the regulations promulgated thereunder, that allow for the inclusion of uncompensated care, the Medicare Cost Shift, Payor Discounts and appeals of the DRG rate for patients whose DRG rate exceeds total cost by at least $250.00; and it is further

ORDERED that the State Defendants are permanently enjoined from enforcing these provisions. This permanent injunction will take effect as of June 5, 1992; and it is further

ORDERED that this Court declines to exercise its pendent and supplemental jurisdiction over plaintiffs restitution claims; and it is further

ORDERED that plaintiffs' motion for summary judgment as to its state and fed-

---

**20.** This Court can dismiss summarily plaintiffs' procedural due process and illegal delegation of taxing power challenges to the DRG scheme. Plaintiffs' contend that the manner in which hospital rates are set constitutes an illegal delegation of the taxing power from the state to the Commissioner. Even if the charges included in the DRG rate constitute a tax under New Jersey law this court must dismiss plaintiffs' claim.

New Jersey has recognized that Legislatures have broad delegation powers. The Legislature must simply set out standards to guide the agency and its administrators. *Association of New Jersey College Faculties, Inc. v. Board of Higher Education*, 112 N.J.Super. 237, 258, 270 A.2d 744 (Law Div.1970). The rates at issue are set according to standards established by the Legislature and not determined solely at the whim of the Commissioner. In fact, the manner in which hospital rates are set has withstood these precise challenges. *In Re Schedule of Rates for Barnert Memorial Hospital*, 92 N.J. 31, 41–42, 455 A.2d 469 (1983); *In Re William B. Kessler Memorial Hospital*, 78 N.J. 564, 397 A.2d 656 (1979); *Borland v. Bayonne Hospital*, 72 N.J. 152, 158–59, 369 A.2d 1, *cert. denied*, 434 U.S. 817, 98 S.Ct. 56, 54 L.Ed.2d 73 (1977).

Additionally, even if plaintiffs challenge to the appeal process can be interpreted as a procedural due process claim, it would still fail. Plaintiffs have not established that New Jersey ever allowed them to receive the benefit of an appeal. Thus, New Jersey has never deprived plaintiffs of any benefit accorded them. Therefore, plaintiffs have no basis on which to advance a procedural due process claim to the appeal process.

eral constitutional claims is denied; and it is further

ORDERED that defendants' motion for summary judgment as to plaintiffs' state and federal constitutional claims is granted; and it is further

ORDERED that defendants' claim that this Court has no jurisdiction over this suit pursuant to the Tax Injunction Act is denied; and it is further

ORDERED that the State Defendants' immunity claim brought under the Eleventh Amendment is denied.